Thank you, Mr. Mousley. Our next case is Miller v. DHS. May it please the Court. Scott Oswald on behalf of the petitioner, Stanley Miller. The issue for the Court today is… Can I ask just a threshold problem? Certainly. This is a seven-day suspension. Why are we here? The reason we're here, Your Honor, is that… Is there some great precedent being set by this case? There is, Your Honor, both in general and for Mr. Miller specifically. For Mr. Miller specifically, he has a 20-plus year unblemished record with no discipline at all, both with the Secret Service and with the Department of Homeland Security. It is uncontroverted that prior to the discipline in this case, he had no discipline in his record at all. We had a trial with 11 witnesses that went through all the facts and frankly found that there's now a blemish on his record. And how does this Court reconsider that based on that factual record? Very easily, Your Honor, because the Court below made a fundamental error in law. That, of course, consistent with the government's own concession, is for this Court's de novo review. In particular, the issue before the Court, the first issue, is whether the CAR factors, the factors that apply when a Court has determined that the agency has used the individual's protected disclosures as a factor, a contributing factor, in the discipline, whether or not those factors are mandatory or permissive. And even if permissive, whether or not an agency can meet its burden under even a permissive standard where the agency proffers no written policy that describes the transgression and the penalty, or any comparators, any custom evidence that this kind of action they've taken in cases of individuals who are not with civil liability. Similarly situated individuals. It is our position here... Your Honor, I don't understand that. If there's no similarly situated individual who's not a whistleblower, how could the last CAR factor, in your view, ever be satisfied? The agency then, if it does not have a written policy... No, no, forget the written policy. If you can only satisfy the clear and convincing evidence they would have taken the action anyway by showing that somebody who was not a whistleblower was similarly situated and received similar discipline, then if you didn't have somebody who was similarly situated, in your view, you can never satisfy the CAR test. Correct. That's precisely the position we're taking, and here's why. Remember the procedural posture that we're in. The agency has already been determined to have violated the law in that they are using the person's protected activity. In this case, disclosures relating to whether or not security screeners were using appropriate procedures at our airports to protect the flying public from the weapons coming in through those screening procedures, whether or not, under the circumstances, if an agency has been determined to use protected disclosure as a factor in the decision, the standard for the agency is a high one, and they meet it. If they do not have a written policy which they disseminate to employees, they must demonstrate that they take similar actions. If they cannot demonstrate that they take similar actions against non-whistleblowers, they simply cannot meet this very high burden. And that's precisely what Congress intended in writing the statute the way that they did, to provide a high standard of clear and convincing evidence, a burden of proof on the government. And as this Court has set out in CAR, mandatory factors, three factors which this Court has confirmed as recently as the Chamber's decision, in which case the Court remanded the case back to the MSPB to consider certain adverse actions through the prism of a mandatory CAR analysis. So let's look at what we have in this case. You've got a three-factor test. The first two you lose on pretty strong. They had strong evidence. They had little or no motive to punish Mr. Miller. And then the third one is any evidence that the agency takes similar actions. Well, if they have the evidence, they proffered. If they don't, of course, they don't have that evidence. I respectfully disagree, and let me tell you why on those two points. First, when you say strong evidence, the agency proffered the fact that he had, that Mr. Miller had negligently unsecured SSI. All right. There was no policy at all, no written policy at all. There's nothing in the Joint Appendix that the agency has provided a written policy in that regard. Remember this Court's own important declaration in the Greenspan case, which was in 2006. The Court said that we do not look at factors, post hoc factors. What's the written policy that's missing here, about the travel approval? No, the policy on SSI, on what kind of penalty will occur if there is a loss of SSI. Remember what Acosta says himself. In the record, Mr. Acosta says the loss of the SSI could have happened to anyone. That's the decision-maker talking. Those are his statements. It could have happened to anyone, and in fact, it did happen. So what's missing is that we're supposed to have a written policy about what the discipline is for losing it? Correct. In order to have a neutral basis, a strong basis to discipline an individual who has been determined to be a whistleblower, well, the Carr case itself relied upon a disseminated policy that the agency had provided to employees. Isn't it pretty implicit that if you've invested a lot of time and effort in setting up a program, that if somebody compromises it, that's reprehensible, that is something for which you can be punished? Do you have to write down every possible thing that somebody can do wrong while in government service and attach to that a penalty? Oh, no, you don't, unless you're dealing with someone who's... But this is pretty clear that if you're compromising a secret program at the expense of, what was it, $35,000? Isn't that pretty clear to anyone? Do they need to have a written warning that that's somehow a problem? Yes. Yes, why? Here's the reason. Because without it, what happens is what happens here. Are you saying Mr. Miller didn't know he was doing anything wrong? No. In fact, the evidence is that he had the operations plan properly secured. So under the circumstances, there's no question that it was unintentional. The evidence, the uncontroverted evidence before the court was that it was at most negligent, Mr. Acosta himself saying it could have happened to anyone. Indeed, it happened in other cases. We've cited two situations where we had... Malfeasance? It's malfeasance. He made a mistake. Does it matter that it was an unintentional mistake? Yes, it does. First, I was answering your question about whether it was reprehensible. Certainly, there was no intention involved here. And second, because it was negligent, what Acosta himself said was that it could have happened to anyone. That is in the joint appendix where he states that this was simply an accident. And anyone that it happened to would have gotten the same penalty probably, right? The evidence, the uncontroverted evidence is that individuals who lost SSI did not receive a penalty at all. In fact, there were two individuals that came, evidence was at trial, that in fact did not, were not disciplined. Did they cost $35,000 to the government? Were those people less than candid in the way they dealt with the situation, denying it? Were they whistleblowers? Your Honor, respect... There's at least three distinctions right there that say they're different. Let me address each one in turn. First, Your Honor, the proffered reason here changed over time. Initially, in the proposal for removal, it stated nothing about the fact that there was a disruption, it stated nothing about a loss, there was no mention of money at all. That was simply a post hoc justification that was raised at trial. As this Court has said in Greenspan, the personal action is reviewed on the grounds on which the agency based the action when it was taken. We have to look at the decision as it was written at that time. So it was only the loss of SSI. And yes, there was a significant loss in those other two situations. One was a computer with SSI that was lost. The second was a camera taking pictures of various items that were attempted to be smuggled through the screening process. So yes, there was a significant loss in those situations. Remember, too, to your second point about prevarication... You're into your rebuttal time. Do you want to use it? I'm just going to respond to your one point. Remember that Mr. Santana himself stated that he overturned Mr. Acosta's determination about the fact that Mr. Miller had prevaricated. Fine. There was no evidence to support that. Using Mr. Santana's own words, it was overkill. So there is no evidence in the record that the decision at the time was based on anything but the loss of the SSI and this issue relating to Mr. Miller's travel. I'll re-save the remainder of my time for rebuttal. Mr. Austin. Thank you. May it please the Court. The decision of the Board that TSA proved by clear and convincing evidence that it would have temporarily taken away Mr. Miller's team leader duties and proposed to suspend him whether or not he was a whistleblower is supported by substantial evidence and is in accordance with law. As the Court is aware, there are three car factors. In the reply brief, the claimant makes much of a dispute that doesn't exist, and that is whether or not the government is contending that these factors are mandatory. There's a confusion as to the word mandatory. Those factors must be considered by the Board, and it's a non-issue in this case because, in fact, that's exactly what the administrative judge said, that he had to consider all three factors, and he did consider them. What isn't mandatory is that you have to satisfy all three of the car factors. What it is is you have to prove the government has the burden of proving by clear and convincing evidence that it would have taken the same action in the absence of the whistleblowing activity. That has to be proven by all three, by a combination of three factors. If, as in this case, there is no evidence as to similarly situated employees, then the government must prove its burden through factors one and two, which is exactly what happened in this case. If it were otherwise, as Your Honor points out, the first time an action happened, the government would always lose the case. It would be impossible to prove that they would have taken the same action absent the whistleblowing because they will never be a similarly situated employee. There is no convincing argument here that there is a similarly situated employee. There are two employees that Mr. Miller claims are similarly situated. In fact, as long as the whistleblower would keep challenging each time, there would be an inability to prove the third factor. You would never prove under car the third factor. So as long as they are all told to just challenge the car assertion, it will never be proven. That's correct. That's correct. And they cite the Larson case for that. That's demonstrably wrong as demonstrated by this Court's decision in Eunice. Eunice is really exactly this case. In Eunice, this Court concluded there was strong evidence on the first two factors. And as to the third factor, there was no evidence of similarly situated employees. This Court affirmed the decision of the Board that the agency had proven by clear and convincing evidence. With respect to the specific facts concerning the two alleged comparator employees, the Court is absolutely right that the first place that there's a distinction is that there's nothing comparable to the first and third specifications in this case. There's nothing about the travel and there's nothing about the misleading statements. So the only likeness... I have a problem with the misleading statements because he wasn't charged, right? Well, he was charged with it in the proposal. But the deciding official didn't sustain the proposal. That's correct. So that's sort of out of the case, isn't it? Well, I think, Your Honor, since this case is solely about the proposal, it has to be considered because you have to look at whether the proposal is the personnel action for this case. So you have to look at whether... The proposal rather than the decision? That's right. That's right. Because there were actually two separate MSPB actions in this case. And this action is solely based on the proposal. There was a separate action that went to the AJ and to the Board, and the Board decided that the agency would have taken the same action absent of whistleblowing, just as it did in this case. That was not appealed to this Court. So the only action... I'm confused. I don't understand what you're saying. It's very confusing. It's addressed in the first footnote of the Board's decision and also in the first footnote of our brief. There were two separate personnel actions or two separate claims of whistleblowing brought in this case. One was an allegation as to the whistleblowing claim, the proposal, and the second was an allegation as to the decision. They went to the hearing. They were tried together. There were two separate Board decisions, one on the proposal and one on the final decision. The only one that's before the Court now is on the proposal. The one as to the decision was not appealed to this Court. So the only action before the Court right now is Mr. Acosta's proposal for 14 days. The final decision is not before. It's a very unusual setting, but the Court does have jurisdiction over it because of the whistleblowing. It is unusual. But with respect to the two comparator employees, the first one had a laptop stolen from the computer. Being stolen is completely different from losing something, in addition to the fact that the first and third specifications aren't involved. With respect to the second employee, the lost camera, first of all, didn't involve $35,000. It involved $400. In addition, the evidence in this case, and this is at Joint Appendix page 42533, is that there was no SSI on the camera. The employee involved, Mr. Lehman, was very specific in his testimony in indicating that all of the SSI that would have been on the camera had been downloaded, and at the time it was taken, there was no SSI. So those factors are also distinguishing. There are two defenses that are raised as to the travel, and I want to dispose of them. One is that supervisory approval wasn't required. That is demonstrated by the record to be false, Mr. Acosta's testimony at JA 42262, and Mr. Van Shufflin's testimony at JA 42217 and 42224 through 26. Did Acosta have a motive to retaliate because Miller jumped the chain of command here? No, he didn't, Your Honor. We have cited in our brief his email where he actually applauded Mr. Miller when he revised his email and said, Very well done. The only motive he had was to make sure that this vetting system was done in an organized fashion from their office. There was no motive to retaliate at all. In fact, as the administrative judge correctly found, these SOP proposals had nothing whatsoever to do with their department. They were not the responsibility of the department, so if for some reason the proposed changes to the SOPs were completely ridiculous and whoever wrote them was blameworthy, they wouldn't have any reflection on Mr. Acosta at all, and so they didn't really have any interest in that at all. There was a vetting process. After all, the whole purpose of them sending out the proposed changes to the SOP was to get comments, and all Mr. Acosta wanted was to make sure that there was something that had gone through the line of command before it went up. There was no attempt at all to change the process in terms of the information getting to those people who were vetting them. And also in their reply brief, they talk on the motive to retaliate, about how it's improper to consider the fact of whether or not the substance of the protective disclosures caused a motive to retaliate. There are two cases that make it clear that that is incorrect. One is the Khalil case, which says that there has to be a connection in the motive to retaliate to the whistleblowing, a motive to retaliate for whistleblowing. And also in the Carr case itself, if you look at the facts of Carr and the analysis of this court in Carr, it's very clear that the substance of the disclosures is the key to the motive to retaliate. And what this court did in Carr is went through the substance of Judge Carr's disclosures in that case, and it looked at the New Haven employees and Judge Polsini, and the court concluded that, yeah, they had a motive to retaliate, but that didn't matter because the decision-makers- Outside the chain of command to make this whistleblowing complaint isn't evidence that would support a finding, refuting the clear and convincing determination? No, not because it's relevant to the whistleblowing. Yeah, I would think so. Yeah, I'm just simply saying that the motive to retaliate has to be connected to the whistleblowing, and I'm responding to the reply brief in which they said that the administrative judge erred in saying that the supervisors didn't have a motive to retaliate because the substance- They didn't really care much about the substance of the protected disclosures. That's all I'm commenting on. And that, in fact, in Carr, this court went through and said the fact that the decision-makers were not the subject of Judge Carr's protected disclosures was relevant to determining that they did not have a motive to retaliate. I'm simply saying it's appropriate to look at the substance of the protected disclosures to see whether they give the decision-makers a motive to retaliate, which is exactly what the administrative judge did here. But not merely the substance. It could also be the- It can go beyond that. That's right. It can. And the more tangential it gets to the actual substance of the whistleblowing, the less primitive it is. But, yes, it's relevant and should be considered. And unless the Court has any further questions, that's all I have. Thank you, Mr. Austin. Thank you. Mr. Oswald, you have a little over three and a half minutes. Addressing Mr. Acosta's motive to retaliate, we need look no further than Joint Appendix 8087. This is the email that he sends to Mr. Miller immediately after Mr. Acosta finds out that Mr. Miller has been circumventing him and raising Mr. Miller's concerns to individuals in the policy branch. The email says as follows, from Mr. Acosta, Mr. Miller, effective immediately, you are not to forward any more communications regarding any testing procedures or recommendations concerning the SOP to anyone outside this office without clearance from this office. And Mr. Acosta tells you what he was thinking when he's writing that email at Joint Appendix 42, 251 through 52. This is in our brief at pages 24 and 25. Question. Mr. Acosta, and it is your position that even if Mr. Miller had believed that he had found something that evidenced great potential danger in the SOPs, he was not to break the chain of command, correct? Answer. He had to follow chain of command. Yes. Question. And if Mr. Miller breaks the chain of command to communicate that he believes what are grave dangers to the public, you believe that the appropriate disciplines would include counseling, correct? Answer. Correct. Dismissal. Correct. Answer. Depends. Yes. Could be. Suspension. Answer. Suspension. Yes. Question. Anything? Could be anything. This goes right to the mind of Mr. Acosta, the person that is solely responsible for meeting out the discipline in this case. Now, remember that right the day before, the day before the issue of the travel even comes up, and remember Mr. Miller, the reason that he's simply trying to get back with the other group leaders. He's a group leader. They all go on the day before. He believes that he should be on that travel schedule. That's what this is all about. He gets in the elevator with Mr. Santana, and he says, Mr. Santana, quote, this is at page joint appendix 8088, I feel there is a potentially catastrophic policy flaw in the new SOP, and I would like to send you an e-mail regarding your concern. Mr. Walsh, who is Mr. Acosta's direct supervisor, says, get me the F, expletive, out of here. In that elevator, when Mr. Miller is raising his concerns, there couldn't be clear evidence of animus on the part of the decision makers. And then, this is after the case has already gone to the MSPB, and the deposition of Mr. Van Shufflin is going to occur. Mr. Acosta and Mr. Walsh then approach Mr. Van Shufflin about changing the testimony in an affidavit that he had provided to the MSPB. This is at joint appendix 8051. This is strong evidence, both at the time that Mr. Miller is raising his concerns and after, when he is litigating those concerns before the MSPB, of the strong motive of Mr. Acosta. And even Mr. Santana himself, in May of 2008, when he is looking at the decision that Mr. Acosta has meted out, says that Mr. Acosta's decision is, quote-unquote, overkill. He himself is recognizing Mr. Acosta's animus in this case. That's at joint appendix 42, 450, and 451. So there is an abundance of evidence of motive in this case. No written policy at all, and no comparator evidence by the agency that's been processed.